IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR A WARRANT AUTHORIZING THE INSTALLATION AND MONITORING OF A TRACKING DEVICE IN OR ON 2018 RED FORD F-150 PICKUP TRUCK, VIRGINIA LICENSE PLATE NUMBER UJG3872, VIN NUMBER 1FTEW1E55JFB33754 | Case No. 1:22-SW-132<br><br>**UNDER SEAL** |

**AFFIDAVIT IN SUPPORT OF APPLICATION FOR**
**INSTALLATION AND USE OF A TRACKING DEVICE**

I, Jenna Sullivan, being duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 3117 to authorize the covert installation and monitoring of a Global Positioning System ("GPS") mobile tracking device on or in a 2018 Ford F-150 pickup truck, Virginia license plate number UJG3872, VIN #1FTEW1E55JFB33754 ("SUBJECT VEHICLE"), and to remove the same device covertly, and for further continued sealing of the matter until the investigation into the conspiracy at issue is concluded or disclosure would not otherwise jeopardize the ongoing investigation. The SUBJECT VEHICLE is registered to Yesli Amaya, 2116 Maleady Dr, Herndon, Virginia, but is known to be currently used by Wilian Moya HERNANDEZ ("HERNANDEZ") in furtherance of distribution of, and a conspiracy to distribute, cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841 and 846, within the Eastern District of Virginia. I maintain that there is probable cause to believe that the

installation and use of such a tracking device on the SUBJECT VEHICLE will lead to evidence, fruits, and instrumentalities of the aforementioned crimes as well as the identification of individuals who are engaged in the commission of those and any related crimes.

2. I have been a Deputy Sheriff with the Loudoun County, Virginia, Sheriff's Office since 2008. Since 2018, I have been assigned to the Drug Enforcement Administration ("DEA") High Intensity Drug Trafficking Task Force in Reston, Virginia. At that time, I was deputized as a DEA Task Force Officer empowered by law to investigate violations of the federal narcotics laws and related offenses and to execute search and seizure warrants.

3. During my employment with the Loudoun County Sheriff's Office and the DEA, I have received training and experience in interviewing and interrogation techniques, arrest procedures, search warrant applications, surveillance, undercover operations, operations involving cooperating sources, and a variety of other investigative tools available to law enforcement officers. In the course of my training and experience, I have become familiar with the methods and techniques associated with the distribution of narcotics, the laundering of proceeds derived from the sale of narcotics, and the organization of narcotics conspiracies. In the course of conducting these investigations, I have been involved in the use of the following investigative techniques, among others: interviewing informants, cooperating sources, and cooperating defendants; conducting physical surveillance; conducting short-term undercover operations; consensual monitoring and recording of both telephonic and non-telephonic communications; analyzing telephone pen register and caller identification data; conducting court authorized electronic surveillance; preparing and executing search warrants which have led to substantial seizures of narcotics, firearms, contraband, and narcotics-related assets; and the analysis of financial documents and records.

4.      During my employment with the Loudoun County Sheriff's Office and the DEA, I have authored, executed, and participated in numerous search and seizure warrants for illegal narcotics and related paraphernalia.  I have participated in the operation of at least three Federal Title III orders.  I have arrested and/or participated in the arrest of numerous persons for violations of various state and federal narcotics and firearms.  Based upon this experience, I have become knowledgeable of the methods and modes of narcotics operations, and the language and patterns of drug abuse and trafficking, and I have testified in grand jury proceedings and in state and federal court.

5.      Law enforcement officers utilized two cooperating sources, Cooperating Source-1 ("CS-1")[1] and Cooperating Source-2 ("CS-2")[2], regarding this investigation.  For the purpose of this affidavit, these individuals will be referred to in the masculine gender regardless of their true gender.  CS-1 was established as source by the DEA in August 2015.  During the entire time that CS-1 has been active, CS-1 has provided information which has proven to be truthful and to the extent possible has been corroborated through various investigative techniques and independent investigation.  To my knowledge, none of the information provided to me or any other members of law enforcement by CS-1 has proved to be false, misleading, or inaccurate in any material respect.  Additionally, CS-1's assistance has led to the arrests and successful prosecutions of approximately 38 cell heads, retail dealers, transporters, couriers, and money launderers and the seizure of the following:  approximately $3,609,000 in U.S. currency, 145 kilos of cocaine, 36

---

[1] CS-1 is a paid source who has no criminal history.

[2] CS-2 was originally charged with simple possession of cocaine in July 2021.  That charge has been dismissed, and he is now a paid source.

kilos of heroin, 12 kilos of fentanyl, 250 pounds of marijuana and marijuana products, 43 firearms, and 10 vehicles.

6. CS-2 was established as a source by the Loudoun County Sheriff's Office in August 2021. During the entire time that CS-2 has been active, CS-2 has provided information which has proven to be truthful and to the extent possible has been corroborated through various investigative techniques and independent investigation. To my knowledge, none of the information provided to me or any other members of law enforcement by CS-2 has proved to be false, misleading, or inaccurate in any material respect.

7. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. §§ 841 and 846 (distribution of and conspiracy to distribute cocaine) have been committed and/or will be committed by Brayan CARRANZA ("CARRANZA"), Flor MENDEZ Hernandez ("MENDEZ") HERNANDEZ, and others.

8. The facts and information contained in this affidavit are based upon my personal knowledge, information obtained from state and federal law enforcement officers, and information provided by cooperating codefendants. All observations not personally made by me were relayed to me by the individuals who made them or are based on my review of reports, documents, and other physical evidence obtained during the course of this investigation. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

**SUMMARY OF PROBABLE CAUSE**

9. In July 2021, the DEA and the Loudoun County Sheriff's Office initiated an investigation targeting a drug-trafficking organization involving Brayan CARRANZA, Flor MENDEZ Hernandez, Wilian Moya HERNANDEZ, and others.

10. On or about November 4, 2021, under the direction of law enforcement, CS-2 contacted CARRANZA via Facebook phone call, and requested to purchase two (2) ounces of cocaine. CARRANZA advised CS-2 that the cocaine would cost $2,800 and that CARRANZA needed a ride to pick up the cocaine from La Frontera Deli, located at 24075 Stone Springs Boulevard in Sterling, Virginia, which is a restaurant owned by HERNANDEZ.

11. On or about November 4, 2021, agents met with CS-2 in preparation for a controlled purchase of cocaine from CARRANZA. Agents searched CS-2 for contraband and currency with negative results. Agents provided CS-2 with a transmitting device, recording device, and Official Advanced Funds ("OAF") before following CS-2 to CARRANZA's residence. CS-2 picked up CARRANZA and agents followed CS-2's vehicle to La Frontera Deli, where CARRANZA exited the vehicle and entered La Frontera Deli. Agents observed the SUBJECT VEHICLE parked in the parking lot of La Frontera Deli, unoccupied. After a few minutes, CARRANZA returned to CS-2's vehicle and the vehicle departed the area followed by law enforcement. CS-2 dropped CARRANZA off at Mi Hacienda restaurant in Sterling, Virginia.

12. Agents followed CS-2 to a neutral location, where CS-2 transferred custody of two (2) bundles of cocaine, each wrapped in aluminum foil obtained from CARRANZA to agents. CS-2 advised that he observed HERNANDEZ exit La Frontera Deli with CARRANZA. CS-2 further advised that CARRANZA told him that the cocaine was supplied by HERNANDEZ and that he (CARRANZA) witnessed HERNANDEZ breaking the two (2) ounces of cocaine off a full

kilogram of cocaine inside La Frontera Deli. The suspected cocaine was submitted to the Virginia Department of Forensic Science for testing. Analysis revealed that the substance supplied to CS-2 by CARRANZA was cocaine.

13. On or about January 21, 2022, under the direction of law enforcement, CS-1 placed a phone call to MENDEZ and requested to purchase one (1) ounce of cocaine. MENDEZ advised CS-1 that the price would be $1,400 and the cocaine would be coming from HERNANDEZ. CS-1 and MENDEZ agreed to meet at Stone Springs Hospital, located at 24440 Stone Springs Blvd in Dulles, Virginia, to conduct the transaction. Agents conducted surveillance on MENDEZ and observed MENDEZ travel to Mi Hacienda restaurant, located in Sterling, Virginia, and meet with HERNANDEZ in the parking lot. Agents followed MENDEZ from Mi Hacienda to Stone Springs Hospital.

14. On the same date, agents met with CS-1 in preparation for a controlled purchase of cocaine from MENDEZ. Agents searched CS-1 for contraband and currency with negative results. Agents provided CS-1 with a transmitting device, recording device, and OAF before following CS-1 to Stone Springs Hospital. Agents observed MENDEZ arrive at Stone Springs Hospital and park next to CS-1's vehicle. Agents observed MENDEZ exit her vehicle and enter the passenger seat of CS-1's vehicle. After a few minutes, MENDEZ was observed exiting CS-1's vehicle and agents followed MENDEZ from Stone Springs Hospital to La Frontera Deli.

15. Agents followed CS-1 from Stone Springs Hospital to a neutral location, where CS-1 transferred custody of one (1) bundle of cocaine wrapped in aluminum foil obtained from MENDEZ to agents. The suspected cocaine was submitted to the DEA Mid-Atlantic Laboratory for testing, the results of which are pending.

16. On or about February 7, 2022, under the direction of law enforcement, CS-2 contacted CARRANZA via Facebook phone call, and requested to purchase one (1) ounce of cocaine. CARRANZA advised CS-2 that it would be $1,400 and that CARRANZA needed a ride to pick up the cocaine.

17. On or about February 7, 2022, agents met with CS-2 in preparation for a controlled purchase of cocaine from CARRANZA. Agents searched CS-2 for contraband and currency with negative results. Agents provided CS-2 with a transmitting device, recording device, and OAF before following CS-2 to pick up CARRANZA in Fairfax, Virginia. After CS-2 picked up CARRANZA, agents followed CS-2's vehicle to the parking lot of New and Used Restaurant Equipment store located at 14502 Hotel Lee Road in Chantilly, Virginia. A short time later, agents observed the SUBJECT VEHICLE pull into the New and Used Restaurant Equipment parking lot. Shortly thereafter, agents observed CARRANZA exit CS-2's vehicle and enter the back driver's side of the SUBJECT VEHICLE. A short time later, agents observed CARRANZA exit the SUBJECT VEHICLE, walk back to CS-2's vehicle, and get into the passenger seat of CS-2's vehicle. Agents followed CS-2's vehicle to the area of CARRANZA's residence where CS-2 dropped CARRANZA off.

18. Agents followed CS-2 to a neutral location, where CS-2 transferred custody of one (1) bundle of cocaine, wrapped in aluminum foil obtained from CARRANZA, to agents. CS-2 advised that he observed HERNANDEZ to be the driver of the SUBJECT VEHICLE when it arrived to the parking lot. The suspected cocaine was submitted to the DEA Mid-Atlantic Laboratory for testing, the results of which are pending.

19. On or about February 12, 2022, under the direction of law enforcement, CS-2 contacted CARRANZA via Facebook phone call, and requested to purchase five (5) ounces of

cocaine. CARRANZA advised CS-2 that it would be $6,200 and that CARRANZA needed a ride to pick up the cocaine from HERNANDEZ.

20. On or about February 12, 2022, agents met with CS-2 in preparation for a controlled purchase of cocaine from CARRANZA. Agents searched CS-2 for contraband and currency with negative results. Agents provided CS-2 with a transmitting device, recording device, and OAF before following CS-2 to pick up CARRANZA in Fairfax, Virginia. After CS-2 picked up CARRANZA, agents followed CS-2's vehicle to the area of Wilkes Court, Herndon, Virginia. Shortly thereafter, agents observed the SUBJECT VEHICLE pull into the same area on Wilkes Court, and park near building 2110. A short time later, agents observed CARRANZA exit CS-2's vehicle and walk toward the SUBJECT VEHICLE and out of sight of agents. Not long after, agents observed HERNANDEZ and CARRANZA reappear near the SUBJECT VEHICLE. HERNANDEZ then entered the driver's seat of the SUBJECT VEHICLE and CARRANZA entered the passenger seat of the SUBJECT VEHICLE. Soon after, agents observed CARRANZA exit the SUBJECT VEHICLE, walk back to CS-2's vehicle, and get into the passenger seat of CS-2's vehicle. Agents followed CS-2's vehicle to the area of CARRANZA's residence where CS-2 dropped CARRANZA off.

21. Agents followed CS-2 to a neutral location, where CS-2 transferred custody of five (5) bundles of cocaine, each wrapped in aluminum foil obtained from CARRANZA, to agents. CS-2 advised that during the controlled purchase, CARRANZA told CS-2 that HERNANDEZ thanked CS-2 for his business. The substance was field tested by agents and tested positive for the presence of cocaine. The suspected cocaine was submitted to the DEA Mid-Atlantic Laboratory for testing, the results of which are pending.

22. On or about February 22, 2022, under the direction of law enforcement, CS-2 contacted CARRANZA via Facebook phone call, and requested to purchase four (4) ounces of cocaine. CARRANZA advised CS-2 that it would be $5,000 and that CARRANZA needed a ride to pick up the cocaine from HERNANDEZ.

23. On or about February 22, 2022, agents met with CS-2 in preparation for a controlled purchase of cocaine from CARRANZA. Agents searched CS-2 for contraband and currency with negative results. Agents provided CS-2 with a transmitting device, recording device, and OAF before following CS-2 to pick up CARRANZA in Fairfax, Virginia. After CS-2 picked up CARRANZA, agents followed CS-2's vehicle to the parking lot of Shoppers Square in Manassas, Virginia. A short time later, the SUBJECT VEHICLE was observed pulling into the parking lot and parking a few spaces behind CS-2's vehicle. Agents observed CARRANZA exiting CS-2's vehicle and entering the passenger seat of the SUBJECT VEHICLE. Shortly thereafter, agents observed CARRANZA exiting the SUBJECT VEHICLE and entering CS-2's vehicle. Agents followed the SUBJECT VEHICLE as it traveled from the Shoppers Square parking lot to a trailer park located on Dogan Lane in Manassas, Virginia. A short time later, agents observed the SUBJECT VEHICLE exit the trailer park and drive back to the Shoppers Square parking lot. Agents observed the SUBJECT VEHICLE pull next to CS-2's vehicle and CARRANZA exit CS-2's vehicle and make contact with the driver's side of the SUBJECT VEHICLE. Not long after, CARRANZA walked away from the SUBJECT VEHICLE and got back into CS-2's vehicle. Agents followed CS-2's vehicle to the area of CARRANZA's residence where CS-2 dropped CARRANZA off.

24. Agents followed CS-2 to a neutral location, where CS-2 transferred custody of four (4) bundles of cocaine, each wrapped in aluminum foil obtained from CARRANZA, to agents.

CS-2 advised that during the controlled purchase, CARRANZA told CS-2 that HERNANDEZ left the Shoppers Square location to go pick up the cocaine from a stash location. The suspected cocaine was submitted to the DEA Mid-Atlantic Laboratory for testing, the results of which are pending.

25. Law enforcement has conducted periodic surveillance of HERNANDEZ from July 2021 through February 22, 2022. During these occasions, law enforcement has observed the SUBJECT VEHICLE parked at HERNANDEZ's residence, located at 24083 Stone Springs Blvd. in Sterling, Virginia, during the morning and evening hours. Law enforcement has also observed the SUBJECT VEHICLE to be frequently parked on Wilkes Court in Herndon, Virginia, and law enforcement is aware that HERNANDEZ has a girlfriend who lives at 2100 Wilkes Court #102 in Herndon, Virginia. Law enforcement has never observed anyone other than HERNANDEZ operating the SUBJECT VEHICLE.

26. Based on the information above it is my belief that HERNANDEZ is involved in the above-described drug violations, which have occurred, are presently occurring, and will continue to occur, and that HERNANDEZ has used, is using, and will continue to use the SUBJECT VEHICLE in furtherance of his illicit drug trafficking activities. It is my belief that the information gathered through the tracking of the SUBJECT VEHICLE will likely identify other co-conspirators of HERNANDEZ, possible meeting locations that HERNANDEZ and his co-conspirators use to conduct narcotics transactions, and will help to identify HERNANDEZ's source(s) of supply for the cocaine.

## THE SUBJECT VEHICLE

27. The SUBJECT VEHICLE is a 2018 red Ford F-150 4D pickup truck bearing Virginia license plate number UJG3872 and VIN #1FTEW1E55JFB33754. The SUBJECT

VEHICLE is registered to Yesli Amaya, 2116 Maleady Dr. in Herndon, Virginia, but known to be utilized by Wilian Moya HERNANDEZ. The registered owner of the SUBJECT VEHICLE is the sister of HERNANDEZ's girlfriend, Yancy Amaya. Based on my training and experience, drug traffickers normally do not use vehicles registered under their name.

28. This warrant requests authority to monitor the tracking device for a period of 45 days following the issuance of the warrant. As previously stated, law enforcement anticipates the information gathered through the tracking of the SUBJECT VEHICLE will likely identify other co-conspirators of HERNANDEZ, possible meeting locations that HERNANDEZ and his co-conspirators use to conduct narcotics transactions, and will help to identify HERNANDEZ's source(s) of supply for the cocaine.

## PLACEMENT OF THE GPS DEVICE

29. In order to track the movement of the SUBJECT VEHICLE effectively and to decrease the chance of detection, I seek authorization to place a tracking device on the SUBJECT VEHICLE while it is in the Eastern District of Virginia. The SUBJECT VEHICLE is usually parked at HERNANDEZ's residence located at 24083 Stone Springs Blvd, Sterling, Virginia, which is in the Eastern District of Virginia, during the overnight hours, or at HERNANDEZ's girlfriend, Yancy Amaya's, apartment complex located at 2100 Wilkes Court in Herndon, Virginia, which is also within the Eastern District of Virginia. However, since HERNANDEZ sometimes parks the SUBJECT VEHICLE in parking lots or other private property, it may be necessary to enter onto private property to affect the repair and/or replacement of the tracking device if required.

30. To ensure the safety of the executing officer(s) and to avoid premature disclosure of the investigation, it is requested that the Court authorize the installation, maintenance, and

removal of the tracking device during both daytime and nighttime hours. I know, based upon my training and experience, that installing/maintaining the tracking device during daylight hours can lead to the identification of law enforcement officers, and cause the investigation to be compromised. Therefore, if law enforcement officers attempt to install/maintain the tracking device during daylight hours, and unbeknownst to the installing law enforcement officers the SUBJECT VEHICLE is being utilized during that same time, law enforcement officers could be in a position where they would: (1) be vulnerable to hostility by the driver of vehicle; (2) be required to identify themselves; and (3) jeopardize the investigation being conducted. For these same reasons, I request that investigators be permitted to recharge and to repair the device as needed, by physically securing the SUBJECT VEHICLE or utilizing clandestine means if necessary. Finally, upon the termination of the requested Order, I ask that investigators be permitted to secure the SUBJECT VEHICLE in order to remove and recover the device.

31. In the event the Court grants the application, there will be periodic monitoring of the tracking device during both daytime and nighttime hours for a period not to exceed 45 days following issuance of the warrant. The tracking device may produce signals from inside private garages or other such locations not open to the public or visual surveillance.

32. In accordance with 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), I further request that the warrant delay notification of the execution of the warrant for 30 days after the end of the authorized period of tracking (including any extensions thereof) because there is reasonable cause to believe that providing immediate notification may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice would seriously jeopardize the ongoing investigation by prematurely revealing its existence and giving suspects an opportunity to

flee from prosecution, destroy or tamper with evidence, intimidate potential witnesses, notify confederates, and change patterns of behavior.

33. I further request that the warrant and accompanying affidavit and application in support thereof, which reveal details related to an ongoing criminal investigation, be sealed until further order of the Court in order to avoid premature disclosure of the investigation, guard against the flight of fugitives, and better ensure the safety of agents and others, except that copies of the warrant in full or redacted form may be maintained by the United States Attorney's Office and may be served on Special Agents and other investigative and law enforcement officers of the FBI, federally deputized state and local law enforcement officers, and other government and contract personnel acting under the supervision of such investigative or law enforcement officers, as necessary to effectuate the warrant.

## **CONCLUSION**

34. WHEREFORE, I respectfully request based on the foregoing that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 3117, that authorizes members of the DEA or their authorized representatives, including but not limited to other law enforcement officers and technicians assisting in the above-described investigation, to covertly install a GPS tracking device on the SUBJECT VEHICLE within the Eastern District of Virginia within ten days of the issuance of the proposed warrant, to maintain, repair, or replace the tracking device as necessary, and to covertly remove the tracking device from the SUBJECT VEHICLE after the use of the tracking device has ended; to surreptitiously enter the residence of HERNANDEZ at 24083 Stone Springs Blvd. in Sterling, Virginia or the residence of HERNANDEZ's girlfriend, Yancy Amaya, at 2100 Wilkes Court in Herndon, Virginia, and/or move the SUBJECT VEHICLE to affect the installation, repair, replacement, and

removal of the tracking device; and to monitor the tracking device for a period of 45 days following the issuance of the warrant, including when the tracking device is inside private garages and other locations not open to the public or visual surveillance, both within and outside the Eastern District of Virginia.

Respectfully submitted,

*Jenna Sullivan*

Task Force Officer Jenna Sullivan
Drug Enforcement Administration

Attested to by the applicant in accordance with the
requirements of Fed. R. Crim. P. 4.1 by telephone
on March 2, 2022.

_____
The Honorable John F. Anderson
United States Magistrate Judge